IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| VIDSTREAM, LLC | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | Civil Action No. 3:16-CV-0764-N |
| | § | |
| TWITTER, INC., | § | |
| | § | |
| Defendant. | § | |

# MEMORANDUM OPINION AND ORDER

This Order addresses Defendant Twitter, Inc.'s ("Twitter") motion to dismiss Plaintiff VidStream, LLC's ("VidStream") Second Amended Complaint ("SAC") [194]. Although the Court previously granted a similar motion, recent authority from the Federal Circuit persuades the Court that it must deny the current motion.

## I. Procedural History

Original plaintiff Youtoo Technologies LLC filed this action against Twitter for patent infringement. Twitter moved to dismiss under Rule 12(b)(6) arguing that the patents were addressed to unpatentable subject matter under 35 U.S.C. § 101. *See* Motion to Dismiss [28]. The Court eventually granted the motion to dismiss. *See* Order (Nov. 10, 2016) [39] (the "First MTD Order"). A somewhat complicated process followed. Twitter filed for inter partes review with the Patent Trial and Appeal Board. Eventually the IPR proceedings were resolved in favor of Youtoo. *See* Notice [181]; Notice [183].

Meanwhile, Youtoo went into bankruptcy. During the bankruptcy process, VidStream acquired the rights to the patents-in-suit. Eventually, the Court let VidStream in, let Youtoo out, granted VidStream's motion to reconsider the First MTD Order, and granted VidStream leave to file its SAC. *See* Order (Apr. 19, 2021) [190]. VidStream filed its SAC and Twitter's motion to dismiss followed.

## II. *ALICE* IN THE FEDERAL CIRCUIT

> Section 101 states a patent can be obtained for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. "Whether a claim is drawn to patent-eligible subject matter is an issue of law." *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1331 (Fed. Cir. 2010); *see also In re Bilski*, 545 F.3d 943, 950 (Fed. Cir. 2008) ("[w]hether a claim is drawn to patent-eligible subject matter under § 101 is a threshold inquiry"). The Supreme Court articulated a two step approach for resolving whether a claim falls outside the scope of section 101. First, "the Court must first determine whether the claims at issue are directed to a patent-ineligible concept." *Alice Corp. Pty Ltd. v. CLS Bank Int'l*, [573 U.S. 208,]134 S. Ct. 2347, 2355 (2014). If so, the Court then "consider[s] the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id*. (quoting *Mayo*, 132 S. Ct. at 1298, 1297).

First MTD Order at 2.

One of the first Federal Circuit cases to address *Alice* was *Enfish*.

> Under the first step, the Court determines if the claim at issue falls into an exception to section 101. Courts have "long grappled with the exception that '[l]aws of nature, natural phenomena, and abstract ideas are not patentable.'" *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016) (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, [569 U.S. 576,]133 S. Ct. 2107, 2116 (2013)). Not "all improvements in computer-related technology are inherently abstract." *Enfish*, 822 F.3d at 1335. Where claims "simply [add] conventional computer components to well-known business practices," they are directed toward an abstract idea

> because computers are merely invoked as a tool. *Id.* at 1338. On the other hand, if "the focus of the claims is on the specific asserted improvement in computer capabilities," then the claim may not be directed at an abstract idea. *Id.* In *Enfish,* the Court concluded that the claims at issue were not directed to an abstract idea but instead focused on an "improvement to computer functionality itself, not on economic or other tasks for which a computer is used in its ordinary capacity." *Id.*

First MTD Order at 2-3. *Enfish* dealt with a patent for a novel method of organizing data in a database unlike the traditional table method.

The backdrop for this was the distinction that *Alice* drew between "do it on a computer" and something that actually improves the operation of the computer itself. *Compare Alice*, 573 U.S. at 223 ("Stating an abstract idea while adding the words 'apply it with a computer' simply combines those two steps, with the same deficient result.") *with id.* at 225 ("The method claims do not, for example, purport to improve the functioning of the computer itself."). At first blush, this would suggest a distinction between hardware and software. As the Federal Circuit later described *Enfish,* the line drawing is not quite so simple:

> The claims here are unlike the claims in *Enfish*. There, we relied on the distinction made in *Alice* between, on one hand, computer-functionality improvements and, on the other, uses of existing computers as tools in aid of processes focused on "abstract ideas" (in *Alice*, as in so many other § 101 cases, the abstract ideas being the creation and manipulation of legal obligations such as contracts involved in fundamental economic practices). *Enfish*, 822 F.3d at 1335–36; *see Alice*, 134 S.Ct. at 2358–59. That distinction, the Supreme Court recognized, has common-sense force even if it may present line-drawing challenges because of the programmable nature of ordinary existing computers. In *Enfish*, we applied the distinction to reject the § 101 challenge at stage one because the claims at issue focused not on asserted advances in uses to which existing computer capabilities could be put, but on a specific improvement—a particular database

> technique—in how computers could carry out one of their basic functions of storage and retrieval of data. *Enfish*, 822 F.3d at 1335–36; *see Bascom*, 827 F.3d at 1348–49, 2016 WL 3514158, at *5; *cf. Alice*, 134 S. Ct. at 2360 (noting basic storage function of generic computer). The present case is different: the focus of the claims is not on such an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools.

*Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (2016).

The next case significant to the Court's analysis is *BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016).[1] *BASCOM* dealt with the subject of internet filtering. Given the proliferation of inappropriate content on the internet, it is desirable to be able to filter out such content. *Id.* at 1343. The prior art included two filtering approaches: (1) a customizable filter on the client device, and (2) a noncustomizable filter on the internet service provider's (ISP) server. Each approach had strengths and weaknesses, *Id.* at 1343-44. The invention in *BASCOM* was a customizable filter on the ISP server. *Id.* at 1344.

The Court readily found the patent was directed to the abstract idea of filtering under step 1 of *Alice*. *Id.* at 1348-49. Turning to *Alice* step 2, the Court noted:

> The inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art. As is the case here, an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces.

---

[1] *BASCOM* was released on June 27, 2016. That was after briefing was complete on the First MTD Order, but before the Order issued. Consequently, *BASCOM* was not mentioned in the briefs, no party filed a notice of supplemental authority, the Court's own preparation did not uncover it, and, unfortunately, the First MTD Order does not cite to it.

ORDER – PAGE 4

> The inventive concept described and claimed in the '606 patent is the installation of a filtering tool at a specific location, remote from the end-users, with customizable filtering features specific to each end user. This design gives the filtering tool both the benefits of a filter on a local computer and the benefits of a filter on the ISP server.

*Id.* at 1350.  The Court concluded that under its precedents, this was a sufficiently inventive concept to survive *Alice* step 2.  *Id.* at 1350-52.

### III. CONTENT CREATION AND DISTRIBUTION SYSTEM

The two patents-in-suit are US Patent Nos. 8,464,304 (the "'304 Patent") and 8,601,506 (the "'506 Patent").  The two patents share a common specification and are similar in content, except the '506 Patent also addresses the length of video clips.[2]  The '304 Patent addresses a Content Creation and Distribution System ("CCDS").

The general subject matter of a CCDS is collecting video data from a user, converting that video into the desired format, and distributing the converted video to a distributor.  Video can be stored in digital form in a wide variety of formats.  Formats can vary across a range of factors, e.g., image size, compression type, frame rate, etc.  A user can create video in a variety of ways, e.g., a video camara attached to a personal computer, a laptop with built-in camera.  This collected video can be stored in a variety of formats. A video distributor, e.g., Youtube, or a broadcast cable network, may require video to be in particular formats to ensure, e.g., adequate quality for broadcast purposes.

---

[2] The Court will refer only to the '304 Patent for the balance of this Order, though the analysis applies with equal force to the '506 Patent.

If a user had video in a format that was not supported by a distributor, it was necessary to convert the video from the original, unsupported format into a supported format. This process of converting video from one format to another is called "transcoding." Again, not all transcoders support all video formats. If a user attempts to transcode video from an unsupported format, the transcoder will reject it and system resources are wasted. Thus, in the prior art, format compatibility was enforced by the transcoding software typically on a server. *See generally* SAC ¶¶ 13-20.

The '304 Patent addressed this problem by moving the enforcement of format compatibility from the server to the user client. It contemplates a CCDS running on a server, with users using client devices to create or collect video. The key concept[3] is that the server provides instructions to the user device that cause the video content to be captured in accordance with predetermined constraints, i.e., in a specified format. *See* SAC ¶¶ 22-24. This results in greater efficiency when the server performs the transcoding, because the content is already in a compatible format.

Claim 1 of the '304 Patent is typical:

1. A method performed by data processing apparatus, the method comprising:

receiving video data from a client computing device at a server system, wherein the video data is captured using a camera connected to the client computing device in accordance with instructions executed on the client computing device, wherein the instructions are provided to the client computing device by the server system and cause the video data to be

---

[3] According to VidStream.

>   captured in accordance with predetermined constraints and the predetermined constraints include a frame rate defined by the instructions;
>
>   automatically transcoding the video data, using a server included in the server system, into at least one different format based on at least one of user credentials associated with a user of the client computing device or attributes associated with the video data, wherein at least one format of the transcoded video data defines a video file in a format appropriate for inclusion in a linear television programming broadcast;
>
>   and uploading the transcoded video data to a distribution server for distribution.

'304 Patent 27:57 – 28:10.

## IV. THE PATENTS SURVIVE *ALICE*

The patents-in-suit are directed to collecting video, transcoding video, and distributing video. That fits the format of collect data, process data, output the processed data, which is an abstract idea. *See Content Extraction Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014). It also was a process that was done manually by one or more people, so this also fits the profile of "do it on a computer" that is an abstract idea. *See Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1368 n.2 (Fed. Cir. 2015) (collecting cases). The fact that the video collected is restricted to predetermined constraints does not change this. *See Electric Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) ("Accordingly, we have treated collecting information, including when limited to particular content (which does not change its character as information), as within the realm of abstract ideas."). Accordingly, the patents are ineligible subject matter under step one of *Alice*.

In step two of *Alice,* the Court "consider[s] the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 573 U.S. at 217 (quoting *Mayo*, 132 S. Ct. at 1298, 1297). The Federal Circuit's *BASCOM* decision is instructive:

> BASCOM explains that the inventive concept rests on taking advantage of the ability of at least some ISPs to identify individual accounts that communicate with the ISP server, and to associate a request for Internet content with a specific individual account. . . . According to BASCOM, the inventive concept harnesses this technical feature of network technology in a filtering system by associating individual accounts with their own filtering scheme and elements while locating the filtering system on an ISP server.

*BASCOM*, 827 F.3d at 1350.

> As explained above, construed in favor of BASCOM as they must be in this procedural posture, the claims of the '606 patent do not preempt the use of the abstract idea of filtering content on the Internet or on generic computer components performing conventional activities. The claims carve out a specific location for the filtering system (a remote ISP server) and require the filtering system to give users the ability to customize filtering for their individual network accounts.

*Id.* at 1352. In other words, the inventive concept in *BASCOM* was to move customizable filtering from the client to the server.

The claims here do that in reverse. The inventive concept here is to move video format compatibility enforcement from the transcoder on the server to the video capture process on the client. The Court cannot meaningfully distinguish the proffered inventive concept here from the inventive concept the Federal Circuit found to be patent-eligible in *BASCOM*. The Court, therefore, denies Twitter's motion to dismiss.

ORDER – PAGE 8

CONCLUSION

The Court denies Twitter's motion to dismiss. The parties are directed to confer and report back to the Court in writing fourteen (14) days from the date of this Order regarding the status of this case and where it fits procedurally in the Miscellaneous Order 62 framework.

Signed April 1, 2022.

*David C. Godbey*
United States District Judge