**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| VIDSTREAM, LLC,<br><br>   Plaintiff,<br><br>  v.<br><br>TWITTER, INC.,<br><br>   Defendant. | Case No. 3:16-cv-00764-N-BW |

**DEFENDANT TWITTER INC.'S RENEWED MOTION FOR JUDGMENT AS A
MATTER OF LAW PURSUANT TO RULE 50(B)—OR, IN THE ALTERNATIVE,
MOTION FOR A NEW TRIAL PURSUANT TO RULE 59—AND CONDITIONAL
MOTION FOR ADDITIONAL FINDINGS PURSUANT TO RULE 52(B) AND BRIEF IN
SUPPORT**

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 2

I.    NO REASONABLE JURY COULD FIND CLAIM 17 WAS VALID, INFRINGED, OR IS WORTH MORE THAN NOMINAL DAMAGES, BUT AT A MINIMUM A NEW TRIAL IS WARRANTED .... 2

    A.    Claim 17 Is Invalid................................................................................... 2

        1.    Obviousness ................................................................................... 2

        2.    Anticipation................................................................................... 6

    B.    Claim 17 Was Not Infringed ................................................................... 7

        1.    No Direct Infringement Because The Accused Products Do Not Cause Videos "To Be Captured In Accordance With Predetermined Constraints That Include A Frame Rate" .......................... 7

        2.    No Direct Infringement Because The Accused Products Do Not "Receive[]" Instructions From The Same Server System To Which They "Transmit[]" Video Data ...................................................... 8

        3.    No Indirect Infringement Because There Was No Underlying Direct Infringement.................................................................... 9

        4.    At A Minimum, No Infringement After April 3, 2025 ............................. 9

    C.    VidStream Failed To Establish Damages For Claim 17 ......................................... 9

        1.    No Reasonable Jury Could Find VidStream Adequately Apportioned ................................................................................... 10

        2.    No Reasonable Jury Could Find That The Four Documents Mr. Weinstein Relied Upon Were Comparable............................................... 13

        3.    At Minimum, This Court Should Grant Remittitur Or A New Trial ........ 15

II.    IF THIS COURT ACCEPTS VIDSTREAM'S ARGUMENT THAT THE JURY'S INVALIDITY FINDINGS SHOULD BE DISREGARDED, THIS COURT SHOULD ADDRESS THE VALIDITY OF THOSE CLAIMS ON THE MERITS UNDER RULE 50(B) OR RULE 52(B).............................. 17

III.    A NEW TRIAL ON CLAIM 17 IS WARRANTED IN LIGHT OF TWO INSTRUCTIONAL ERRORS AND VIDSTREAM'S DISREGARD OF A MIL AND CURATIVE INSTRUCTION ........................ 19

    A.    The Jury Instructions Contained Two Errors That Require A New Trial............. 19

        1.    The Jury Should Not Have Been Instructed On Any Secondary Considerations Of Non-Obviousness......................................................... 19

        2.    The Jury Should Have Been Instructed On The Availability Of Nominal Damages...................................................................... 21

B.      VidStream's Repeated Violation Of Twitter MIL 1—And Disregard Of This Court's Curative Instruction—Requires A New Trial ................................... 23

CONCLUSION ............................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple Inc. v. Wi-Lan Inc.*,
 25 F.4th 960 (Fed. Cir. 2022) ...................................................................................................14

*Bayer Healthcare LLC v. Baxalta Inc.*,
 989 F.3d 964 (Fed. Cir. 2021)...................................................................................................25

*Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*,
 967 F.3d 1353 (Fed. Cir. 2020)................................................................................................13

*Christopher v. Florida*,
 449 F.3d 1360 (11th Cir. 2006) ................................................................................................25

*CommScope Techs. LLC v. Dali Wireless Inc.*,
 10 F.4th 1289 (Fed. Cir. 2021) ..................................................................................................7

*CSIRO v. Cisco Sys., Inc.*,
 809 F.3d 1295 (Fed. Cir. 2015).................................................................................................11

*DP Sols., Inc. v. Rollins, Inc.*,
 353 F.3d 421 (5th Cir. 2003) .....................................................................................................23

*EcoFactor, Inc. v. Google LLC*,
 122 F.4th 892 (Fed. Cir. 2024) .................................................................................................17

*Ericsson, Inc. v. D-Link Sys., Inc.*,
 773 F.3d 1201 (Fed. Cir. 2014)..............................................................................................2, 20

*Flexuspine, Inc. v. Globus Med., Inc.*,
 2016 WL 9276025 (N.D. Tex. Oct. 3, 2016)........................................................................17, 18

*Fox Factory, Inc. v. SRAM, LLC*,
 944 F.3d 1366 (Fed. Cir. 2019)..............................................................................................6, 20

*Garretson v. Clark*,
 111 U.S. 120 (1884)..................................................................................................................11

*Genentech, Inc. v. Sandoz Inc.*,
 55 F.4th 1368 (Fed. Cir. 2022) ..................................................................................................6

*Hannon v. Nevitt*,
 2013 WL 12290978 (N.D. Tex. Mar. 14, 2013)........................................................................2

*iLife Techs., Inc. v. Nintendo of Am., Inc.*,
   839 F. App'x 534 (Fed. Cir. 2021) ......................................................................16

*Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*,
   757 F. App'x 974 (Fed. Cir. 2019) .......................................................................2

*Info-Hold, Inc. v. Muzak LLC*,
   783 F.3d 1365 (Fed. Cir. 2015)..........................................................2, 10, 21, 22

*Inline Plastics Corp. v. Lacerta Grp., LLC*,
   97 F.4th 889 (Fed. Cir. 2024) ............................................................................19

*IP Innovation L.L.C. v. Red Hat, Inc.*,
   2010 WL 9501469 (E.D. Tex. Oct. 13, 2010) ......................................................7

*Janssen Pharms., Inc. v. Mylan Labs., Ltd.*,
   2025 WL 946390 (Fed. Cir. Mar. 28, 2025)........................................................9

*Kaist IP US LLC v. Samsung Elecs., Co.*,
   439 F. Supp. 3d 860 (E.D. Tex. 2020)...............................................................17

*KSR Int'l Co. v. Teleflex Inc.*,
   550 U.S. 398 (2007)............................................................................................4

*LKQ Corp. v. GM Glob. Tech. Operations LLC*,
   102 F.4th 1280 (Fed. Cir. 2024) ......................................................................2, 3

*Lucent Techs., Inc. v. Gateway*,
   580 F.3d 1301 (Fed. Cir. 2009)....................................................................10, 13

*Mas-Hamilton Grp. v. LaGard, Inc.*,
   156 F.3d 1206 (Fed. Cir. 1998)...........................................................................7

*MLC Intell. Prop., LLC v. Micron Tech., Inc.*,
   10 F.4th 1358 (Fed. Cir. 2021) .........................................................................12

*Oiness v. Walgreen Co.*,
   88 F.3d 1025 (Fed. Cir. 1996)...........................................................................17

*Omega Patents, LLC v. CalAmp Corp.*,
   13 F.4th 1361 (Fed. Cir. 2021) .........................................................................10

*Pantech Corp. v. OnePlus Tech. (Shenzhen) Co.*,
   2024 WL 5510402 (E.D. Tex. Aug. 2024) .........................................................25

*Prometheus Labs., Inc. v. Roxane Lab'ys, Inc.*,
   805 F.3d 1092 (Fed. Cir. 2015)..........................................................................20

*Ravgen, Inc. v. Laboratory Corp. of America Holdings*,
No. 25-1570, Dkt. 1-2 (Fed. Cir. Mar. 21, 2025)....................................................17

*Regents of Univ. of Cal. v. Broad Inst., Inc.*,
903 F.3d 1286 (Fed. Cir. 2018)..................................................................................3

*ResQNet.com, Inc. v. Lansa, Inc.*,
594 F.3d 860 (Fed. Cir. 2010)......................................................................13, 14, 15

*Ruiz v. A.B. Chance Co.*,
234 F.3d 654 (Fed. Cir. 2000)..................................................................................21

*Salazar v. HTC Corp.*,
2019 WL 13252791 (E.D. Tex. Mar. 7, 2019) .........................................................18

*Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs., Am., Inc.*,
895 F.3d 1304 (Fed. Cir. 2018)................................................................................21

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011)................................................................................16

*VirnetX, Inc. v. Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014)................................................................................10

*Whitehead v. Food Max of Miss., Inc.*,
163 F.3d 265 (5th Cir. 1998) .............................................................................23, 25

*Z4 Techs., Inc. v. Microsoft Corp.*,
507 F.3d 1340 (Fed. Cir. 2007)................................................................................19

*ZUP, LLC v. Nash Mfg., Inc.*,
896 F.3d 1365 (Fed. Cir. 2018)............................................................................6, 20

## Rules & Statutes

35 U.S.C. § 284.......................................................................................................22

Fed. R. Civ. P. 50..............................................................................................1, 2, 18

Fed. R. Civ. P. 52.................................................................................................2, 18

Fed. R. Civ. P. 59........................................................................................................1

Fed. R. Evid. 702 .....................................................................................................15

**INTRODUCTION**

The jury has already largely rejected VidStream's case by finding five of the six asserted claims invalid and not infringed, and awarding VidStream a fraction of the $632 million it sought. But the jury did not go far enough. JMOL should be entered in Twitter's favor because no reasonable jury could find—or, in the alternative, a new trial is necessary because it was against the great weight of the evidence for the jury to find—that Claim 17 of U.S. Patent 8,464,304 ("'304 Patent") was valid, infringed, or worth $105 million. *See* Fed. R. Civ. P. 50(b), 59. The jury's nine-figure damages award—for a single, seldomly used functionality in the multi-feature accused products—is particularly unsupportable. Mr. Weinstein's testimony failed to satisfy the apportionment requirement, as he conceded both that (1) the accused products included "numerous features" beyond the accused functionality and (2) he had made no attempt whatsoever to "value the … noninfringing features"—even while acknowledging that the evidence showed that just 2% of Twitter users or less utilize the accused feature. *See, e.g.*, 4/9 Trial Tr. 67-71, 148-151. Logically, Mr. Weinstein could not have determined the "value attributable to the patented features, as distinct from other, unpatented features," Dkt. 446 at 30 (jury charge), without first discerning the value of the unpatented features. In any event, the four documents Mr. Weinstein relied upon for his damages estimate were not remotely comparable. Indeed, VidStream failed to establish the documents even covered the invention claimed by the '304 Patent.

At minimum, Twitter respectfully submits this Court should order a new trial for Claim 17 due to instructional error and VidStream's conduct at trial. *First*, it was erroneous for the jury instructions to include all seven secondary considerations of non-obviousness listed in the AIPLA Model Instructions without a prior assessment by the Court as to whether VidStream met its burden of production for each consideration. The very Model Instruction that this Court relied upon warns against this approach, AIPLA Model Instruction V.7.4 & practice note (2025 ed.), and the Federal

1

Circuit has reversed based on a comparable instruction, *see Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201, 1230-1231, 1235 (Fed. Cir. 2014) (*Georgia-Pacific* factors). **Second**, the jury should have been instructed it had the authority to award nominal damages if VidStream's damages case was weak, *see Info-Hold, Inc. v. Muzak LLC*, 783 F.3d 1365, 1372 (Fed. Cir. 2015), a particularly devastating omission given VidStream's damages case was marginal at best. **Third**, VidStream's repeated disregard of this Court's MIL and subsequent curative instruction regarding the duration of the litigation unfairly inflamed the jury to rule against Twitter.

Finally, while Twitter submits this Court should enter judgment on the jury's findings that Claims 22-24 of the '304 Patent and Claims 22-23 of U.S. Patent 8,601,506 ("'506 Patent") are invalid, VidStream has indicated it intends to ask this Court to set those findings aside. If this Court adopts VidStream's (erroneous) argument, then Twitter asks this Court to resolve Twitter's outstanding invalidity counterclaims on the merits under either Rule 50(b) or Rule 52(b).

## ARGUMENT

JMOL is appropriate where the "facts and inferences point so strongly and overwhelmingly in favor of [the moving party] that … reasonable jurors could not arrive at a contrary verdict." *Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*, 757 F. App'x 974, 977 (Fed. Cir. 2019). This Court "may grant a new trial if, for instance, the verdict was against the great weight of the evidence, the trial was unfair, prejudicial error was committed during the trial, or damages were excessive." *Hannon v. Nevitt*, 2013 WL 12290978, at *2 (N.D. Tex. Mar. 14, 2013).

**I.  NO REASONABLE JURY COULD FIND CLAIM 17 WAS VALID, INFRINGED, OR IS WORTH MORE THAN NOMINAL DAMAGES, BUT AT A MINIMUM A NEW TRIAL IS WARRANTED**

**A.  Claim 17 Is Invalid**

**1.  Obviousness**

Obviousness turns on four factors: (1) "the scope and content of the prior art," (2) "the

differences between the prior art and the claims at issue," (3) "the level of ordinary skill in the pertinent art," and (4) "secondary considerations" of nonobviousness. *LKQ Corp. v. GM Glob. Tech. Operations LLC*, 102 F.4th 1280, 1291, 1298-99 (Fed. Cir. 2024) (en banc). Here, everyone agrees that a skilled artisan would have a Bachelor of Science in electrical engineering, computer engineering, or computer science and roughly two years of experience "in the area of network video," or the equivalent. *E.g.*, 4/8 Trial Tr. 142. No reasonable jury could have found (or it was at least against the great weight of the evidence for the jury to find) Claim 17 valid after considering the other factors. This is particularly so because (1) VidStream made a strategic decision not to present any rebuttal evidence on validity, meaning Dr. Almeroth's testimony was undisputed and (2) the jury rightly found the other asserted claims invalid, all of which are **narrower** than Claim 17 and thus logically should have been **more** difficult to invalidate. Indeed, the **only** claim limitation that appears in Claim 17 but not Claim 22 of the '304 Patent (which the jury found invalid) is the requirement to "transmit video data … during the continuous recording segment"—i.e., transmitting while live-streaming. Dr. Almeroth provided unrebutted testimony that limitation was satisfied by the Covell System. 4/14 Trial Tr. 54-58, 62-65.

*First*, as to the scope and content of the prior art, the undisputed evidence at trial established that (1) Wowza and FMLE are prior art and (2) a skilled artisan **in fact** combined them prior to Claim 17's priority date. *See Regents of Univ. of Cal. v. Broad Inst., Inc.*, 903 F.3d 1286, 1291 (Fed. Cir. 2018) (relevant inquiry is whether a skilled artisan would have been "motivated to combine or modify the teachings in the prior art and would have had a reasonable expectation of success in doing so"). As a general matter, software that allows users to capture video for delivery on the Internet has long been known. 4/14 Trial Tr. 47-48. Adobe made a software product called Adobe Flash Media Live Encoder ("FMLE") that did precisely that. *Id*. And FMLE was used

with server software, such as Wowza, to upload the video and provide the video for distribution on the Internet.  *Id*.

Undisputed testimony establishes that FMLE and Wowza could have been used—and in fact were used—together as a combined system before January 25, 2011 (the priority date of Claim 17).  *See* 4/14 Trial Tr. 44-50, 71, 215-216.  It is also undisputed the Wowza/FMLE system was able to record video (including at a frame rate preselected from several predetermined frame rates), transcode video, and upload video to a server during the continuous recording segment prior to the priority date.  Specifically, Mr. Andrew Covell testified that by May 2010 he had personally used Wowza and FMLE together to do just that.  4/10 Trial Tr. 215; *see also* 4/14 Trial Tr. 48-49.  That same month, he also posted on a blog about using Wowza and FMLE together for a livestreaming event on University of Illinois-Chicago's campus, which was "very popular."  4/10 Trial Tr. 214.

**Second**, as to the comparison between the prior art and asserted claims, Dr. Almeroth testified that Claim's 17 elements are present in (or would be obvious to add to) the Wowza/FMLE combination.  *See* 4/14 Trial Tr. 60, 65; *see also KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420-21 (2007) (noting that obviousness analysis requires use of "[c]ommon sense").  Specifically:

- The FMLE software is a non-transitory computer storage medium encoded with a computer program, the program comprising instructions that when executed by a data processing apparatus cause the data processing apparatus to perform operations.  4/14 Trial Tr. 59-60; DTX-106.

- The FMLE software allows for displaying, on a client computing device, a user interface adapted to allow a user to selectively record content including high definition or standard definition video content through a digital camera communicably coupled to the client computing device.  4/14 Trial Tr. 60; *see also* DTX-106; DTX-161.

- The FMLE software and Covell log files establish the user interface is provided in accordance with instructions received from a server system and the instructions cause the content to be captured in accordance with predetermined constraints that include a frame rate defined by the instructions.  4/14 Trial Tr. 61; *see also* DTX-106; DTX-99; DTX-96.

  o Specifically, (1) the log files show the Covell System had a predetermined constraint including a frame rate of 30fps, DTX-99, DTX-96, and the software itself shows several frame rate constraints, DTX-106; (2) the software itself and Mr. Covell's logs show other general constraints, such as video format and resolution, DTX-106, DTX-99, DTX-96; and (3) Mr. Covell himself testified that the FMLE/Wowza system allowed him to meet his goal of resolving video format compatibility issues when livestreaming.  4/10 Trial Tr. 208.

- The FMLE software receives a user selection to record content, 4/14 Trial Tr. 61-62, DTX-106, DTX-96, and the Covell log files show that Mr. Covell's implementation received a user selection to record content, DTX-96.

- The FMLE software allows for capturing high definition or standard definition video data using a digital camera during a continuous recording segment.  4/14 Trial Tr. 62; *see also* DTX-106.

- The FMLE software includes an encoder and allows for formatting the high-definition video data in accordance with the predetermined constraints.  4/14 Trial Tr. 62; *see also* DTX-106; 4/10 Trial Tr. 208 (Mr. Covell testifying regarding his goals for the FMLE/Wowza system).

- The FMLE software transmits the formatted high-definition or standard-definition video data to a storage server of the server system using the connection in response to the user selection.  4/14 Trial Tr. 62-63; DTX-106; DTX-88.  FMLE transmits at least a portion of the formatted high-definition video data to a storage server of the server system during the continuous

recording segment as well.  4/14 Trial Tr. 56-58, 62-63; DTX-106; DTX-88.[1]

*Third*, as to the secondary considerations of non-obviousness, Dr. Almeroth presented unrebutted testimony that there was no evidence of any such considerations in this case.  *See* 4/14 Trial Tr. 74-75.  VidStream, on the other hand, made no real attempt to meet its "burden of production" to provide evidence of secondary considerations, *ZUP, LLC v. Nash Mfg., Inc.*, 896 F.3d 1365, 1373-74 (Fed. Cir. 2018), and certainly did not meet its burden to establish that any theoretical secondary consideration has the required "nexus" to the asserted claims, *see Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019); *see also infra* pp. 19-21 (discussing lack of evidence).  Regardless, Dr. Almeroth testified any secondary considerations of nonobviousness that might exist would not outweigh the overwhelming evidence establishing obviousness.  *See, e.g.*, 4/14 Trial Tr. 72; *see also Genentech, Inc. v. Sandoz Inc.*, 55 F.4th 1368, 1378 (Fed. Cir. 2022) (finding obviousness despite "[w]eak secondary considerations" evidence).

### 2.      Anticipation

At minimum, this Court should grant Twitter a new trial on Claim 17 because the great weight of the evidence supports a finding that Claim 17 is anticipated by the Covell System.  *See* Dkt. 446 at 16-17 (anticipation instruction).  Here, Dr. Almeroth provided unrebutted testimony that all elements of Claim 17 and the other asserted claims were present in (and arranged/combined in the same way) in Mr. Covell's "actual implementation of … Flash Media Live Encoder, and then the Wowza Media Server" into a single system—a single system that Mr. Covell "built" himself in "April to the middle of 2010," months before the priority date for Claim 17.  4/14 Trial

---

[1] VidStream's assertion that Dr. Almeroth did not provide sufficient testimony regarding why the claims were obvious under his construction, Dkt. 437 at 5, is a red herring.  As the immediately following paragraphs of transcript show, Dr. Almeroth's statement came in the context of discussing a specific claim limitation where his reading of the claims differed from those of Dr. Jones—i.e., the "appropriate for inclusion in a linear television programming broadcast" limitation.  4/14 Trial Tr. 157-158.  Claim 17 does not include that limitation.

6

Tr. 44-58; *see also id*. 59-65 (comparing *inter alia* Claim 17's elements to the Covell System); *supra* pp. 4-6. Mr. Covell's process for building his system was corroborated by contemporaneous documents, such as publicly available blog posts which provide "instructions … almost like the recipe for how to take these pieces and put them together and to get it to do the functionality of [the] system." *Id.* 49; *see also id.* 49-50 (discussing the log files associated with the Covell System which were "almost a step-by-step log, like a scientific notebook, that describes what the software was actually doing that he was running at the time"). As Twitter's counsel later summarized in closing, the evidence shows that Mr. Covell combined FMLE and Wowza to make a single system in the same way that a person making lunch might combine Jif peanut butter and Smuckers jelly to make a single sandwich. 4/15 Trial Tr. 91; *see also IP Innovation L.L.C. v. Red Hat, Inc.*, 2010 WL 9501469 (E.D. Tex. Oct. 13, 2010) (Rader, J.) (finding "no error in using multiple references to describe a single prior art system for the purpose of showing anticipation").

### B.     Claim 17 Was Not Infringed

In a literal infringement case, "[t]he burden is on a patent owner to show that 'the properly construed claim reads on the accused device exactly.'" *CommScope Techs. LLC v. Dali Wireless Inc.*, 10 F.4th 1289, 1298 (Fed. Cir. 2021); *accord Mas-Hamilton Grp. v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998) (no infringement "[i]f even one limitation is missing").

#### 1.     No Direct Infringement Because The Accused Products Do Not Cause Videos "To Be Captured In Accordance With Predetermined Constraints That Include A Frame Rate"

No reasonable jury could find—or it was at least against the great weight of the evidence for this jury to find—that the accused products contain a user interface for recording video that is provided with "instructions [that] *cause* the content to be captured in accordance with predetermined constraints that include *a frame rate defined by the instructions*." *See* PTX-1 at

7

29:27-31).[2]  The accused products do not produce video at frame rates that are "defined by the instructions"—rather, the accused products send a *request* to the mobile devices' operating systems, and the mobile operating system ultimately does "whatever it wants."  *See* 4/9 Trial Tr. 16-17, 182-183 (Mr. Lohner testifying Twitter does not "control the camera" and rather "request[s] that the camera try and capture given certain specific parameters"); 4/14 Trial Tr. 30-31 (Dr. Almeroth stating the values for the frame rate are "put into the request that [is] then passed to the operating system").  As Dr. Almeroth explained, this means that the accused products do not cause video to be captured in accordance with a set frame rate.  4/14 Trial Tr. 27-28.  To the contrary, they use *variable* frame rates that range from 18.738 FPS to 62.155 FPS.  *Id*. 29-30.

Notably, Dr. Jones did not seriously dispute Dr. Almeroth's analysis.  Dr. Jones conceded the rates he looked at during testing were for "average frame rate," not the "frame rate … over the course of the videos."  4/8 Trial Tr. 248.  But the *average* rate says nothing about whether the accused product's rate at any given moment is defined by set instructions.  4/14 Trial Tr. 28-30.

      2.      **No Direct Infringement Because The Accused Products Do Not "Receive[]" Instructions From The Same Server System To Which They "Transmit[]" Video Data**

No reasonable jury could find—or it was at least against the great weight of the evidence for the jury to find—that Twitter's accused products "receive[]" instructions from the same "server system" as "*the* server system" to which the "formatted [] video data" is "transmit[ed]."  PTX-1 at 29:27-39.  Rather, the instructions for transcoding video are "received" from non-Twitter servers—when the user downloads the accused products from the Apple app store for iPhones or the Google Play store for Android mobile devices—but the video data is "transmitted" to a Twitter server.  4/14 Trial Tr. 22-24.  Just as a reader would generally purchase a book (and the written

---

[2] Emphasis added unless otherwise noted.

material within) from a bookstore rather than the author, a user of the accused products would acquire them (and the instructions within) from Google/Apple rather than Twitter. *Id*. 23-24.

Dr. Jones again failed to seriously dispute Dr. Almeroth's analysis. He agreed the server where the "file is actually downloaded from is the Apple app store servers or the Google store servers," neither of which are owned by Twitter. 4/8 Trial Tr. 250. And he conceded Twitter "doesn't control Apple's servers" and "doesn't control the Google servers." *Id*. As Dr. Jones acknowledged, "when [the Twitter] app is downloaded to the client device, it's downloaded from someone else's servers and not Twitter's." *Id.* 250-51.

### 3. No Indirect Infringement Because There Was No Underlying Direct Infringement

Because Twitter's accused products do not infringe Claim 17, Twitter is entitled to JMOL or at least a new trial on VidStream's induced infringement theory. There can be no induced infringement without an underlying act of direct infringement. *See, e.g.*, *Janssen Pharms., Inc. v. Mylan Labs., Ltd.*, 2025 WL 946390, at *3 (Fed. Cir. Mar. 28, 2025).

### 4. At A Minimum, No Infringement After April 3, 2025

No reasonable jury could find (or the great weight of evidence would be against a finding of) direct or induced infringement after April 3, 2025. Periscope had long been "discontinued by Twitter," 4/9 Trial Tr. 71-72 (Weinstein), Vine was not alleged to have infringed Claim 17, and Dr. Jones has conceded the Twitter App would not infringe any of the asserted claims of the '304 Patent "if Twitter were to remove the frame rate setting from its in-app camera functionality for any of the accused apps," 4/8 Trial Tr. 252. Mr. Lohner testified that—as of April 3, 2025—the Twitter app's pre-recorded video on demand and live video features no longer have "any settings for the frame rate for capturing video through its in-app camera." 4/9 Trial Tr. 229-30.

### C. VidStream Failed To Establish Damages For Claim 17

9

A patentee is entitled to no less than a reasonable royalty upon establishing infringement of a valid patent, but "[w]here the patentee's proof is weak, the court may award nominal damages." *Info-Hold*, 783 F.3d at 1372; *see also Lucent Techs., Inc. v. Gateway*, 580 F.3d 1301, 1335 (Fed. Cir. 2009). The evidence in this case did not support more than nominal damages.

### 1.     No Reasonable Jury Could Find VidStream Adequately Apportioned

"The law requires patentees to apportion the royalty down to a reasonable estimate of the value of its claimed technology, or else establish that its patented technology drove demand for the entire product." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014). As in *VirnetX*, where the Federal Circuit vacated an award based on Mr. Weinstein's testimony, Mr. Weinstein (and VidStream) "did neither." *Id.*; *see also, e.g.*, *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1377-78 (Fed. Cir. 2021) (patentee "did not present sufficient evidence to the jury to sustain its damages award" where patentee failed to properly apportion). Mr. Weinstein's testimony simply did not give the jury the necessary information to arrive at a reliable damages number—particularly because he made no attempt to value the ***non-infringing features*** of the accused products before determining the value of the lone accused feature.

***First***, Mr. Weinstein did not provide any evidence to support an entire market value theory. He admitted he had not determined whether the purportedly infringing "upload functionality is more or less important to driving usage of the [Twitter] app than all of the other features and functionalities." *See* 4/9 Trial Tr. 69-70. And he failed to present any evidence whether the supposedly infringing aspects of Periscope products drove demand. *E.g.*, *id.* 71.

***Second***, in the absence of an entire market value theory, Mr. Weinstein was required—but failed—to "apportion value between the [purportedly] patented feature[] and the vast number of non-patented features contained in the accused products." *VirnetX, Inc.*, 767 F.3d at 1329. Specifically, Mr. Weinstein acknowledged both that (1) the Twitter app includes "numerous

features" beyond the accused functionality, such as "[t]ext tweeting," "[a]udio tweeting," "[p]hotos, "[d]irect messages," "[p]olling," "[s]earch," "[r]ecommendation algorithms," and "[t]rending topics," 4/9 Trial Tr. 67-69, and (2) he had done ***nothing*** to value those non-infringing features before providing his damages opinion for the Twitter app:

> Q. You did not do any kind of analysis of the relative value of the video functionality to the Twitter mobile app versus all of the features and functionalities that are available to users through the app; isn't that right?
> A. I didn't value the – the noninfringing features, that's true.

4/9 Trial Tr. 68; *see also id.* 71 (similar for Periscope). This approach—focusing on only the purported benefits of the invention without also identifying the benefits added by the non-infringing aspects—is impossible to square with the fundamental principle that a plaintiff must "apportion … damages ***between*** the improvement constituting the patented feature and the other features." *Garretson v. Clark,* 111 U.S. 120, 121-122 (1884); *see also CSIRO v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) ("[All] expert damages opinions must ***separate*** the value of the allegedly infringing features from the value of all other features."). More broadly, no reasonable jury could have relied on Mr. Weinstein's overall apportionment analysis to determine the value of Claim 17 because Mr. Weinstein's damages estimate assumed that Vine infringed. 4/9 Trial Tr. 58-60. Notably, Vine was not alleged to infringe Claim 17 (as opposed to other asserted claims). *See* 4/8 Trial Tr. 202.

While Mr. Weinstein used the word "apportion" several times in his testimony, nothing he said satisfies the standards laid out in cases like *VirnetX*, *Garretson*, and *CSIRO*. Mr. Weinstein did not, for example, adjust the royalty base in any way to apportion out the non-infringing features. Rather, the base included every single U.S. Twitter user during the damages period— even those who did not use the infringing functionality. 4/9 Trial Tr. 64-66. And while apportionment can be achieved by adjusting the rate, VidStream indicated during the charge-

conference process that Mr. Weinstein was not attempting to satisfy the apportionment requirement by adjusting the royalty rate—and, by making this argument, persuaded this Court to strike a proposed jury instruction. *Compare* App. 034 (Court's original proposed charge, including instruction regarding how to "determin[e] the appropriate royalty base and the appropriate royalty rate") *with* Dkt. 446 at 30 (Court's as-delivered charge).   Finally, neither Mr. Weinstein nor VidStream have claimed that any of the four documents Mr. Weinstein relied upon for his damages estimate were so similar to the circumstances of the hypothetical negotiation that the documents fall under the narrow built-in apportionment doctrine. *Cf. MLC Intell. Prop., LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1374 (Fed. Cir. 2021) (separate apportionment analysis not necessary where "apportionment 'is essentially embedded in [the] comparable value' from the prior agreement").

To be sure, Mr. Weinstein purported to "apportion" the value of Youtoo's patents by making marginal downward adjustments to the dollar figures to three of the four documents he relied upon. *See* 4/9 Trial Tr. 35-36 (Asia TV); *id.* 37-38 (signed Verizon MOU); *id.* 56-57 (Periscope acquisition document).[3]  But none of these modifications accounted for the value of the claimed invention *in the context of those documents*, much less the value of the noninfringing features.  For the Asia TV agreement, for example, Mr. Weinstein admitted that his reduction did not "consider any evidence or data about how much Asia TV or its users used" any purported video-upload functionality.  4/9 Trial Tr. 88.  For the Periscope document, Mr. Weinstein conceded the "potential revenue scenario" he relied upon to value a feature discussed in the document (i.e., ads being inserted at the beginning of certain replayed videos) did not actually require the use of the allegedly infringing Periscope feature. *See* 4/9 Trial Tr. 97.  And for the signed Verizon MOU, Mr. Weinstein's only adjustment to the 11-cents-per-user fee for an app that could do all manner

---

[3] Mr. Weinstein did not even attempt to adjust the rate in a fourth document—an unsigned Verizon MOU. *See* 4/9 Trial Tr. 38-39.

of things—"on demand or live programming" and "participatory services including social commentary, voting, gamification [and] watch parties"—was to lower the fee based on how often *Twitter* users now (not Verizon users then) watch video content. 4/9 Trial Tr. 89-91. Worse, Mr. Weinstein's modification to the Verizon MOU dramatically overestimated Twitter user's utilization of the accused functionality, as it swept in all users who ***watch*** video—not the tiny percentage of users who actually use the Twitter app to record and upload video in the app, which is all that is accused. *Id.* 94.

### 2. No Reasonable Jury Could Find That The Four Documents Mr. Weinstein Relied Upon Were Comparable

A damages award based on documents that are "'radically different from the hypothetical agreement under consideration'" cannot stand. *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) (quoting *Lucent Techs.*, 580 F.3d at 1327-28). "Assessing the comparability of licenses requires a consideration of whether the license at issue involves comparable technology, is economically comparable, and arises under comparable circumstances as the hypothetical negotiation." *Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1372-73 (Fed. Cir. 2020). No reasonable jury could find Mr. Weinstein adequately accounted for such differences.

***First***, VidStream failed to put forth evidence that the documents Mr. Weinstein relied upon involved comparable technology. None of the four documents conveys a patent license or mentions the '304 or '506 Patents. *E.g.*, 4/9 Trial Tr. 83; *see also* supra pp. 12-13 & n.3 (discussing the four documents). For example, the agreement with Asia TV was for a ***suite*** of technology for a television network—a "social media website, recording and playback systems, web editors, themes for the web editors, a mobile app and a technology content curation system [media set]." *Id*. 85-86. And the payment terms Mr. Weinstein relied upon on for his analysis were for

13

"bandwidth, in other words, the ability to handle sufficient amounts of data," 4/9 Trial Tr. 33-34, a capability that is not directly related to the accused video capture functionality.

More broadly, none of VidStream's witnesses provided meaningful testimony that the technology covered by the documents included Claim 17 of the '304 Patent or even the '304 Patent as a whole. Dr. Jones' testimony, for example, did not mention the documents. And because Mr. Weinstein is admittedly "not a technical expert," his opinion regarding the scope of the Youtoo documents was rooted in Mr. Reed's testimony. 4/9 Trial Tr. 83-85; *see also id.* 83 (Dr. Weinstein agreeing that he had "not made any judgments as to whether or not the YouToo products practice any claims of the patents"). But Mr. Reed could not (and did not) speak to the technology at issue in Twitter's Periscope document, and he conceded on cross-examination that he had never done "any claim charts at YouToo to map" its patents "to the services [Youtoo] was providing" in the other three documents and had never "analyze[d] whether the 304 or the 506 Patents were more or less integral" to the technology covered by the documents, 4/8 Trial Tr. 98, as opposed to—for example—other Youtoo patents. Indeed, Mr. Reed never once clearly testified that the specific Youtoo documents included the technology covered by the '304 Patent at all—the closest he got was stating generally that "YouToo's client agreements and its memorandums of understandings" "provided each licensee with access to our patented technology." 4/8 Trial Tr. 35. Because neither Mr. Weinstein nor VidStream "attempt[ed] to show that" the documents "embody or use the claimed technology or otherwise show demand for the infringed technology," they cannot support the jury's damages award. *ResQNet.com*, 594 F.3d at 872; *see also Apple Inc. v. Wi-Lan Inc.*, 25 F.4th 960, 972-73 (Fed. Cir. 2022) (expert's failure to explain why asserted patents were particularly "key" to licenses that included other rights meant there was no basis to treat licenses as a "meaningful proxy" for the hypothetical negotiation).

***Second***, the documents Mr. Weinstein relied upon were not economically comparable to the hypothetical negotiation.  For example, the Periscope document was a "deal review" (not agreement) for a project that never came to fruition.  4/9 Trial Tr. 98-101.  While the Periscope document suggested "10 cents a month per use for Periscope" in a single slide, that rate would have been a money-losing proposition for Twitter.  *Id.* 100, 103.  Similarly, neither of the Verizon MOUs ever went into effect.  The signed MOU "was not an actual executed agreement"—it was just a memorandum of understanding about what might (but did not ultimately) happen at some future date.  4/9 Trial Tr. 89.  The other Verizon MOU was unexecuted, and Mr. Weinstein did not know "whether YouToo and Verizon actually ever exchanged [the] document." *Id.* 94-95.

***Finally,*** Mr. Weinstein's analysis failed to account for more relevant documents and other important circumstances surrounding the hypothetical negotiation in this case.  In particular, Mr. Weinstein admitted that he did not rely on ***any*** of the eight patent licenses that Twitter produced in this case—and conceded that he was unaware of any situation where Twitter had entered into a licensing agreement comparable to what he asked the jury to adopt.  4/9 Trial Tr. 113-14 (agreeing that "Twitter never paid any license for any patent that [he is] aware of where it was paying per cent, per user, per month").  The Federal Circuit has reversed a damages award under comparable circumstances, where the expert's damages estimate largely ignored the actual patent licenses and relied primarily on "re-bundling licenses"—i.e., which give rights to products, services, and source code, but not patents.  *ResQNet.com*, 594 F.3d at 870.

### 3.     At Minimum, This Court Should Grant Remittitur Or A New Trial

For all the reasons explained above, the jury's damages verdict—and particularly, its implicit findings that VidStream properly apportioned and relied on sufficiently comparable licenses—is against the great weight of the evidence.  *See supra* pp. 9-15.  Separately, VidStream's flimsy damages case only underscores that FRE 702 and *Daubert* should have barred Mr.

Weinstein from testifying at all.  As explained in Twitter's motion to exclude, Mr. Weinstein's damages methodology is wholly unreliable for the same basic reasons his testimony is insufficient to sustain the jury's verdict—i.e., he failed to provide a reasoned analysis tying his proposed royalty rate to the asserted patents and failed to reliably apportion for the value of the technology. *See* Dkt. 345 at 10-23.  Because Mr. Weinstein's flawed methodology "taint[ed]" the jury's damages calculation, a new trial is warranted.  *See, e.g.*, *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011) (affirming grant of a new damages trial on *Daubert* grounds).

In the alternative, this Court should grant remittitur (or at least a new trial) because the jury's $105 million damages award is excessive.  The jury clearly relied on Mr. Weinstein's flawed methodology, as the ultimate award for the infringement of one patent claim was exactly one-sixth of Mr. Weinstein's estimate for the infringement of six patent claims.  *Compare* 4/9 Trial Tr. 21:8 (Mr. Weinstein testifying claims were worth $632,664,920); *with* Dkt. 446 at 27 (jury awarding $105,444,153).  This amount is shockingly high because—as explained above—Mr. Weinstein's damages award has no basis in the record, not least because he failed to rely on any truly comparable licenses.  The only consummated transaction clearly demonstrating the value of the asserted patents is the bankruptcy sale, which indicates Youtoo's entire patent portfolio was purchased for $5.5 million.  *See* 4/9 Trial Tr. 120-21; *see also, e.g.*, *id.* 105 (Twitter's acquisition of Periscope's technology valued at $2.2 million); *id.* 111 (Twitter's acquisition of SnappyTV's technology valued at $4 million).  Indeed, to Twitter's knowledge, most Texas verdicts issued in the last decade where the jury found infringement of only one patent claim resulted in an award of less than $5.5 million.  The only exceptions are (1) a case where Judge Lynn later granted JMOL in the defendant's favor, *see iLife Technologies, Inc. v. Nintendo of Am., Inc.*, 839 F. App'x 534, 536 (Fed. Cir. 2021); (2) a case that involved a questionable *Daubert* ruling that is now under

16

review by the *en banc* Federal Circuit, *EcoFactor, Inc. v. Google LLC*, 122 F.4th 892 (Fed. Cir. 2024); and (3) a case involving entirely different technology ("methods of detection of genetic disorders") and that is currently pending on appeal, *Ravgen, Inc. v. Laboratory Corp. of America Holdings*, No. 25-1570, Dkt. 1-2 at 55 (Fed. Cir. Mar. 21, 2025).

Because $5.5 million is the largest damages number supportable by the record, Twitter respectfully submits the award should be remitted to that amount. *See, e.g.*, *Kaist IP US LLC v. Samsung Elecs., Co.*, 439 F. Supp. 3d 860, 886-87 (E.D. Tex. 2020) (assessing amount of remittitur based on "the maximum amount the jury could have awarded, based upon the evidence adduced at trial"); *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1030 (Fed. Cir. 1996) (similar).

## II.   IF THIS COURT ACCEPTS VIDSTREAM'S ARGUMENT THAT THE JURY'S INVALIDITY FINDINGS SHOULD BE DISREGARDED, THIS COURT SHOULD ADDRESS THE VALIDITY OF THOSE CLAIMS ON THE MERITS UNDER RULE 50(B) OR RULE 52(B)

Because the jury found that Claim 17 was not infringed, it followed the Court's instruction to continue on to the question of whether all of the asserted claims were invalid. *See* Dkt. 446 at 13 ("If your answer to any part of Question No. 1 [infringement] is 'yes,' then answer the following question [on invalidity].").  The jury subsequently found that Claims 22-24 of the '304 Patent and Claims 23-24 of the '506 Patent were invalid. *Id.*  VidStream has now taken the (erroneous) position that the jury's invalidity findings should not be included in the judgment because the jury was only presented with invalidity as an affirmative defense.  As Twitter's forthcoming response to VidStream's motion for entry of judgment will explain, VidStream's argument is both waived (because VidStream failed to lodge an objection before the jury was discharged) and meritless (because the verdict form can reasonably be read to ask the jury to reach invalidity of all claims).

If this Court adopts VidStream's approach, however, Twitter's invalidity counterclaims for those five claims are currently unadjudicated, *see* Dkt. 216 at 19-20 (Twitter's amended answer), and prevent entry of final judgment, *see Flexuspine, Inc. v. Globus Med., Inc.*, 2016 WL 9276025,

17

at \*5 (N.D. Tex. Oct. 3, 2016).  If that scenario comes to pass, Twitter asks this Court for a merits ruling on the validity of the five claims—either by treating the obviousness of the claims as a "jury issue not decided by a verdict" subject to JMOL under Rule 50(b) or the anticipation/obviousness of the claims as a matter for the Court to resolve in the first instance under Rule 52(b), *see Salazar v. HTC Corp.*, 2019 WL 13252791, at \*3 (E.D. Tex. Mar. 7, 2019).  In short, Claims 22-24 of the '304 Patent and Claims 22-23 of the '506 Patent are invalid for essentially the same reasons already discussed above for Claim 17.  *See supra* pp. 2-6 (obviousness); *supra* pp. 6-7 (anticipation); *see generally* 4/14 Trial Tr. 44-75.  Additionally, Dr. Almeroth provided unrebutted testimony the Covell System included the following elements that do not appear in Claim 17:

- The FMLE software includes predetermined constraints that are adapted to facilitate transcoding (within the Wowza software) of the formatted high definition or standard definition video data into a format appropriate for inclusion in a linear television programming broadcast.  4/14 Trial Tr. 63; *see also* DTX-106, DTX-88; DTX-91.  Wowza specifically can transmit on IPTV (Internet Protocol TV).  4/14 Trial Tr. 63; DTX-91.[4]

- The FMLE software and log files establish the user interface is provided in accordance with instructions received from a server system and the instructions cause the content to be captured in accordance with predetermined constraints that include a video length defined by the instructions.  4/14 Trial Tr. 61; *see also* DTX-106; DTX-99; DTX-96.  Specifically, the FMLE software itself establishes a preset time limit (i.e., 1-hour maximum time limit) which provides a video length, including one where the video length is centrally defined at the server system for a plurality of users.  *See* 4/14 Trial Tr. 56; DTX-106.

---

[4] VidStream has wrongly asserted, Dkt. 437 at 5, that Dr. Almeroth did not present testimony on his own claim scope of this limitation when addressing obviousness.  But Dr. Almeroth explained (1) his and Dr. Jones' understandings of the claims and (2) that a skilled artisan would know how to overcome the issues Dr. Jones raised with Dr. Almeroth's approach.  4/14 Trial Tr. 63, 67-71.

- The FMLE software establishes a connection with a content submission server in response to a user selection to upload the high definition or standard definition video data (here, Wowza). 4/14 Trial Tr. 62; *see also* DTX-106; DTX-88.

- The FMLE software formats the high-definition video data in a native media container format for the client computing device.  4/14 Trial Tr. 64; DTX-106.

- The FMLE software includes instructions transmitted to the client computing device by downloading from a web server and installing on the client device.  4/14 Trial Tr. 64-65, DTX-106; DTX-88; DTX-164.  The FMLE software also allows for capturing high definition or standard definition video data using the digital camera, which includes interfacing with native device recording capabilities.  4/14 Trial Tr. 64-65, DTX-106; DTX-88; DTX-164.[5]

## III.    A NEW TRIAL ON CLAIM 17 IS WARRANTED IN LIGHT OF TWO INSTRUCTIONAL ERRORS AND VIDSTREAM'S DISREGARD OF A MIL AND CURATIVE INSTRUCTION

### A.    The Jury Instructions Contained Two Errors That Require A New Trial

A party seeking a new trial due to an erroneous jury instruction must establish "(1) it made a proper and timely objection to the jury instructions, (2) those instructions were legally erroneous, (3) the errors had prejudicial effect, and (4) it requested alternative instructions that would have remedied the error."  *See Inline Plastics Corp. v. Lacerta Grp., LLC*, 97 F.4th 889, 898 (Fed. Cir. 2024) (internal quotation marks omitted); *see also, e.g.*, *Z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1353 (Fed. Cir. 2007) (applying similar Fifth Circuit test).

#### 1.    The Jury Should Not Have Been Instructed On Any Secondary Considerations Of Non-Obviousness

As the Federal Circuit has explained in the context of the *Georgia-Pacific* factors, it is error

---

[5] Dr. Almeroth also testified that the blog post, maintained on Mr. Covell's server system, included a link to download the software.  4/14 Trial Tr. 127-128.  In any event, as Dr. Almeroth testified, it was well known in the art to have a single server system provide a download for FMLE.  4/14 Trial Tr. 68; *see also* 4/8 Trial Tr. 223-24.

for a court to "parrot" a multi-factor list "to the jury, even if some of those factors clearly are not relevant to the case at hand." *Ericsson*, 773 F.3d at 1230-1231, 1235.  Twitter submits the jury instruction here contained a comparable error by instructing the jury on all seven of the secondary considerations of non-obviousness listed in AIPLA's Model Instruction despite VidStream's failure to meet its burden of production on any of those considerations. *See* Dkt. 446 at 18, 22-23 (instruction); 4/15 Trial Tr. 6-7, 10 (objection); Dkt. 397-1 at 74 n.72 (briefing).

Specifically, the "patentee bears the burden of production with respect to evidence of secondary considerations of nonobviousness." *ZUP*, 896 F.3d at 1373-74.  This includes demonstrating a "nexus" between the secondary consideration and the claimed invention. *See Prometheus Labs., Inc. v. Roxane Lab'ys, Inc.*, 805 F.3d 1092, 1102 (Fed. Cir. 2015).  Where (as here) there are no products that are "coextensive with the patented invention," the patent owner must show "that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Fox Factory*, 944 F.3d at 1373-74.  The AIPLA instructions accordingly advise that the Court should instruct the jury only on the considerations that "ARE RELEVANT IN THIS CASE AND PROPERLY SUPPORTED BY ADMITTED EVIDENCE." AIPLA Model Instruction V.7.4 & practice note (2025 ed.).

VidStream made no meaningful attempt to introduce evidence linking any of the seven considerations on which the jury was instructed to the claimed invention.  VidStream, for example, made a strategic decision not to re-call Dr. Jones to put on a rebuttal invalidity case, *e.g.*, 4/14 Trial Tr. 220, and he thus did not provide testimony on any secondary considerations.  VidStream's counsel instead defended this Court's instruction by asserting "there is testimony in the record from Mr. Reed, for example, and from Mr. Covell himself about": (1) "long-felt need, existing problems in the field [and (2)] failure of others."  4/15 Trial Tr. 6.  But testimony about two

considerations cannot justify instructing the jury on all seven. And even for those two categories, VidStream's counsel failed to identify specific transcript cites or explain how Mr. Reed's and Mr. Covell's testimony met VidStream's burden of production. VidStream's counsel also relied on Dr. Almeroth's testimony rebutting Dr. Jones' anticipated testimony, 4/15 Trial Tr. 6, but Dr. Almeroth testified there was **no** evidence of any considerations of non-obviousness in this case, *see* 4/14 Trial Tr. 74-75. While "secondary considerations, ***when present***, must be considered in determining obviousness," *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 667 (Fed. Cir. 2000), it cannot be the case that testimony that **no** such considerations exist justifies a jury instruction.

Finally, the instruction on secondary considerations was highly prejudicial to Twitter. This was a close case on invalidity, as evidenced by the fact that the jury found that five of the six asserted claims were in fact invalid. By informing the jury that they "***must*** … consider" seven secondary considerations that were unsupported by the record before deciding whether Twitter had met its burden to establish obviousness, the instructions improperly increased Twitter's burden and made it harder for Twitter to prevail on Claim 17. Accordingly, Twitter respectfully submits that a new trial should be held as to whether Claim 17 is obvious and/or anticipated. *See, e.g.*, *Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs., Am., Inc.*, 895 F.3d 1304, 1316 (Fed. Cir. 2018) ("If it is impossible to tell whether a [legally] correct theory has been used, we reverse for a new trial."); *see also* Dkt. 446 at 13 (question asking jury to resolve whether "any of the asserted claims are invalid," without distinguishing between obviousness and anticipation).

### 2.    The Jury Should Have Been Instructed On The Availability Of Nominal Damages

It is well-established that the appropriate reasonable royalty may be nothing more than a nominal damages award when—as here—the patentee's damages case is "weak." *See, e.g.*, *Info-Hold*, 783 F.3d at 1372; *see also supra* pp. 9-15 (discussing lack of evidence supporting damages

21

award).  This Court's proposed jury instruction on damages, however, did not alert the jury to the fact that it could award a very small sum if it concluded that VidStream had presented an unconvincing damages case.  Accordingly, Twitter objected and proposed the following: "If you cannot ascertain damages such as a reasonable royalty with reasonable certainty based on the evidence Plaintiff has put forth, then you may award nominal damages, i.e., an inconsequential or trifling sum such as $1."  4/15 Trial Tr. 10; *accord* Dkt. 397-1 at 80 n.78 (Twitter's briefing).

To date, VidStream has not seriously disputed that *Info-Hold* concluded that a finder-of-fact can award nominal damages based solely on the strength of the plaintiff's case, as opposed to the totality of the evidence.  VidStream has instead previously objected to this instruction based on case law referencing a ***$0*** damages award (as opposed to nominal damages award).  Dkt. 397-1 at 80 n.79.  To be clear, there is no dispute that awarding a $0 reasonable royalty for a valid and infringed patent claim requires surveying the entire record—including the proof introduced by both sides.  VidStream has also contended Twitter's proposed language is cumulative of the remainder of the damages instruction—e.g., the prohibition on awarding "speculative" damages. Dkt. 397-1 at 80 n.79.  But again, whether VidStream met its burden to establish ***any*** compensatory damages is different from whether the jury has the authority to award a small amount of damages.

Finally, failure to give a nominal damages instruction was prejudicial.  VidStream emphasized the text of 35 U.S.C. § 284 during Mr. Weinstein's direct examination, highlighting the fact that a successful patentee is entitled "in no event less than a reasonable royalty." *See e.g.*, 4/9 Trial Tr. 29 ("Q: And why are you focusing on the – the phrase, in no event less than a reasonable royalty for the use made of the invention by the infringer?  A: Well, in the first instance, I'm focusing on it because that's what the law says.").  Had the jury been instructed that—as a matter of law—the reasonable royalty requirement could have been satisfied by a much smaller

amount than Mr. Weinstein's estimate, it may very well have awarded a much smaller sum.

**B.     VidStream's Repeated Violation Of Twitter MIL 1—And Disregard Of This Court's Curative Instruction—Requires A New Trial**

A new trial is warranted where the presentation of a particular argument to the jury "infected … [the verdict with] passion and prejudice." *See, e.g.*, *Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 276-277 (5th Cir. 1998).  In particular, "a large verdict accompanied by a prejudicial closing argument can lead to the conclusion that the argument has an influential impact upon the jury's deliberations." *DP Sols., Inc. v. Rollins, Inc.*, 353 F.3d 421, 432 (5th Cir. 2003).  Here, VidStream infected the jury's verdict with prejudice by repeatedly suggesting—even in the face of a curative instruction—that Twitter purposely delayed this litigation.

Specifically, this Court granted Twitter's MIL 1 to exclude references to, among other things, the duration of the pretrial proceedings.  *See* 4/2 Pretrial Conference ("PTC") Tr. 18; Dkt. 371 at 1-8.  After this Court granted Twitter's MIL, VidStream asked whether "we can[] talk about the timeline of this case" without violating the MIL.  PTC Tr. 20.  This Court answered that— while VidStream could mention "the starting date of this case" or that a "particular fact" "happened after this case was filed"—"[t]o the extent you're wanting to say this case has dragged on and it's because [Twitter] dragged their feet, no."  PTC Tr. at 20-21.

Despite this ruling, VidStream repeatedly raised arguments or elicited testimony that asked the jury to punish Twitter for the nearly ten years that this case has been pending.  In opening, VidStream asserted that its predecessor Youtoo was "having a hard go of it even before it filed the lawsuit, but, you know, it's hard to go at it as it was adding the burden of litigation and having, you know, a big infringer out there like Twitter, and YouToo didn't make it and they ended up filing for bankruptcy."  4/7 Trial Tr. 44.  VidStream also asked the jury to "[r]emember" that Twitter had started infringing in January of 2015" and that "[t]hey kept doing it for, you know ten

23

years"—"if Twitter had wanted to pay fewer royalties and this technology was so unimportant, …

they could have done the responsible thing and acted ten years ago."  4/7 Trial Tr. 54-55; *id.* 56

("This infringement has gone on for a long time and VidStream needs your help.").  Twitter

unsuccessfully objected to this line of argument.  4/7 Voir Dire Tr. 79; 4/7 Trial Tr. 56-58.

As the trial proceeded, every witness put on by VidStream—except for Mrs. Harwell, who

testified only very briefly—was asked questions or provided testimony that referenced the

litigation's length.  *See, e.g.*, 4/7 Trial Tr. 81 (Reed Williams); 4/8 Trial Tr. 83-84 (Ryland Reed);

4/9 Trial Tr. 1-4 (Dr. Jones); 4/9 Trial Tr. 133-34 (Mr. Weinstein); 4/9 Trial Tr. 169 (Fred Lohner);

*see also, e.g.*, 4/14 Tr. 148-49 (VidStream's counsel asking Dr. Almeroth to confirm that, although

he was hired as an expert in 2016, a test had not been performed until 2024).

After the conclusion of Dr. Almeroth's testimony (and at the first opportunity outside of

the presence of the jury) Twitter again requested a curative instruction on the duration of the

proceedings.  *See* 4/14 Trial Tr. 161-62.  This Court granted Twitter's request, and Twitter

highlighted the instruction in its closing argument.  *See* 4/15 Trial Tr. 109-10.  But during

VidStream's closing rebuttal—i.e., at a point where Twitter had no opportunity to respond—

VidStream effectively asked the jury to ignore the instruction:

> Now, you were also shown this right here.  It's instructions from the Court, which I'm super glad that you guys got from the Court.  It says, the lawsuit has been pending an unusually long time due to multiple legitimate reasons.  Don't hold the duration of this lawsuit against either party.
> But then what Twitter does is kind of talk about, well, yeah, that's what we got around to doing tests in 2024.  No, we served a lawsuit on you in 2016 with these patents attached to it.  You could have stopped then, you could have run tests then.  So trying to act like the Court is endorsing Twitter failing to take action after some amount of time is—is truly absurd.  There was nothing that prevented Twitter from stopping infringement in 2016.  Nothing.

4/15 Trial Tr. 117-18.  Twitter objected and (unsuccessfully) requested an additional curative

instruction in light of the fact that the patents had been held invalid by this court between 2016

and 2021. *Id.* 118-19.

VidStream's argument asking the jury to focus on the duration of the litigation—even after the Court instructed that the jury was not to do so—unfairly deprived Twitter of "the benefits of" this Court's MIL and curative instruction, *Christopher v. Florida*, 449 F.3d 1360, 1367 (11th Cir. 2006), and "could serve no purpose other than to inflame the jury," *Whitehead*, 163 F.3d at 278. The comments did indeed serve that purpose. The jury asked this Court whether—in awarding damages—the jury could "designate that the payout *occur over 10 years* (from Twitter)." Dkt. 448 at 2. And the jury ultimately awarded $105 million for the infringement of a single asserted claim—a monumental sum, considering that VidStream's own damages expert conceded that he was "not aware of any evidence in this record that … YouToo ever received even $6 million on any agreement for any technology or any patents." 4/9 Trial Tr. 161. The jury also found Claim 17 infringed despite numerous holes in VidStream's case, *see supra* pp. 7-9, and found willfulness despite the lack of evidence that Twitter had specifically intended to infringe any of the asserted claims in a wanton and malicious manner, *see Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 988 (Fed. Cir. 2021). Under the circumstances, Twitter respectfully submits a new trial on at least the infringement, willfulness, and damages issues for Claim 17 is required. *See Christopher*, 499 F.3d at 1368 (new trial where court order was disregarded during closings); *Pantech Corp. v. OnePlus Tech. (Shenzhen) Co.*, 2024 WL 5510402, at *16 (E.D. Tex. Aug. 2024) (new trial where plaintiff "inappropriately leveraged … prejudicial evidence during its closing arguments").

## CONCLUSION

For the foregoing reasons, Twitter respectfully submits this Court should grant Twitter JMOL on Claim 17 of the '304 Patent or—alternatively—a new trial on Claim 17. Twitter also conditionally asks this Court to resolve the validity of Claims 22-24 of the '304 Patent and 22-23 of the '506 Patent under Rule 50(b) or Rule 52 if the Court finds the jury did not reach those issues.

25

Dated: May 14, 2025

Reshma C. Gogineni (*pro hac vice*)
reshma.gogineni@wilmerhale.com
WILMER CUTLER PICKERING
HALE & DORR LLP
7 World Trade Center 250 Greenwich Street
New York, NY 10007
Telephone: (212) 295-6301
Facsimile: (212) 230-8888

Matthew T. Martens (*pro hac vice*)
matthew.martens@wilmerhale.com
WILMER CUTLER PICKERING
HALE & DORR LLP
2100 Pennsylvania Ave., NW
Washington, DC 20037
Telephone: (202) 663-6921
Facsimile: (202) 663-6363

David L. McCombs (TX Bar No. 13438700)
Charles M. Jones II (TX Bar No. 24054941)
david.mccombs@haynesboone.com
charlie.jones@haynesboone.com
HAYNES AND BOONE, LLP
2801 N. Harwood Street, Suite 2300
Dallas, TX 75201
Telephone: (214) 651-5000
Facsimile: (214) 651-5940

Respectfully submitted,

*/s/ Thomas G. Sprankling*

Sonal N. Mehta (*pro hac vice*)
sonal.mehta@wilmerhale.com
Thomas G. Sprankling (*pro hac vice*)
Thomas.Sprankling@wilmerhale.com
WILMER CUTLER PICKERING
HALE & DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California, 94306
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

Taylor Gooch (*pro hac vice*)
taylor.gooch@wilmerhale.com
WILMER CUTLER PICKERING
HALE & DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
Telephone: (628) 235-1000
Facsimile: (628) 235-1001

Nora Q.E. Passamaneck (*pro hac vice*)
nora.passamaneck@wilmerhale.com
Sydney Donovan (*pro hac vice*)
sydney.donovan@wilmerhale.com
WILMER CUTLER PICKERING
HALE & DORR LLP
1225 17th Street, Suite 2600
Denver, CO 80202
Telephone: (720) 274-3135
Facsimile: (720) 274-3133

*Attorneys for Defendant Twitter, Inc.*

26

## CERTIFICATE OF SERVICE

The undersigned certifies that, on May 14, 2025, the foregoing document was filed electronically with the Clerk of the Court through the CM/ECF system, which will send a notice of electronic filing to all counsel of record who are deemed to have consented to electronic service.

/s/ *Thomas G. Sprankling*
Thomas G. Sprankling

## CERTIFICATE OF CONFERENCE OF COUNSEL

Pursuant to Local Rule 7.1, the undersigned certifies that counsel for VidStream (John Summers) and Twitter (Thomas Sprankling) conferred on May 1, 2, and May 12, 2025 regarding Twitter's conditional Rule 52 motion and that VidStream has stated it understands Twitter's position and opposes Twitter's request.

/s/ *Thomas G. Sprankling*
Thomas G. Sprankling

27